**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

VELOCITY COMMUNICATION
TECHNOLOGIES, LLC,

*Plaintiff,*

v.

CISCO SYSTEMS, INC.,

*Defendant*.

Case No. 5:25-cv-00101-RWS

**DEFNDANT CISCO SYSTEMS, INC.'S FED. R. CIV. P. 12(c) MOTION FOR
JUDMGENT ON THE PLEADINGS AS TO INELIGIBILTIY OF CERTAIN
ASSERTED PATENTS, NO PRE-SUIT WILLFULNESS, AND
<u>NO PRE-SUIT INDUCED OR CONTRIBUTORY INFRINGEMENT</u>**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    LEGAL STANDARD ........................................................................................... 1

    A.     Rule 12(c) Standard .................................................................................. 1

    B.     Patent Eligibility under 35 U.S.C. § 101 .................................................. 1

III.   ARGUMENT ........................................................................................................ 3

    A.     The Claims of the '870 Patent Family Are Ineligible ............................... 3

    B.     The Claims of U.S. Patent No. 8,270,343 Are Patent Ineligible .............. 9

    C.     Velocity's Pre-Suit Willfulness Claims Should Be Dismissed .............. 12

    D.     Velocity's Pre-Suit Induced- and Contributory-Infringement Claims Should Be
        Dismissed ................................................................................................ 14

IV.    CONCLUSION ................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ............................................................................................ *passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................................1

*Atlas Glob. Techs., LLC v. Sercomm Corp.*,
638 F. Supp. 3d 721 (W.D. Tex. 2022) ...............................................................13, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................................................1

*Bench Walk Lighting LLC v. LG Innotek Co., Ltd.*,
2021 WL 65071 (D. Del. 2021), *report and recommendation adopted*, 2021
WL 1226427 (D. Del. Mar. 31, 2021) .......................................................................13

*Broadband iTV, Inc. v. Amazon.com, Inc.*,
113 F.4th 1359 (Fed. Cir. 2014) ..................................................................................8

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018) ............................................................................3, 12

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014) .............................................................................2, 6

*Dialect, LLC v. Bank of Am., N.A.*,
2024 WL 4980794 (E.D. Tex. Dec. 4, 2024) ...............................................12, 13, 14

*Doe v. MySpace Inc.*,
528 F.3d 413 (5th Cir. 2008) .......................................................................................1

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
815 F. App'x 529 (Fed. Cir. 2020) ............................................................................11

*Entropic Commc'ns, LLC v. DISH Network Corp.*,
767 F. Supp. 3d 1043 (C.D. Cal. 2025) .....................................................................11

*Gen. Elec. Co. v. LPP Combustion, LLC*,
773 F. Supp. 3d 117 (D. Del. 2025) .............................................................................7

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) ..................................................................................................13

*Gonzalez v. Kay,*
    577 F.3d 600 (5th Cir. 2009) ....................................................................................1

*In re Killian,*
    45 F.4th 1373 (Fed. Cir. 2022) ................................................................................2

*Orostream LLC v. ABS-CBN Int'l,*
    2015 WL 5836949 (E.D. Tex. Oct. 1, 2015) ............................................................7

*SAP Am., Inc. v. InvestPic, LLC,*
    898 F.3d 1161 (Fed. Cir. 2018)................................................................................2

*Secured Mail Sols., LLC v. Universal Wilde, Inc.,*
    873 F.3d 905 (2017)................................................................................................1

*Smartflash LLC v. Apple Inc.,*
    680 F. App'x 977 (Fed. Cir. 2017) ..........................................................................8

*In re TLI Commc'ns,*
    823 F.3d 607 (2016)................................................................................................9

*Trading Techs. Int'l, Inc. v. IBG LLC,*
    921 F.3d 1378 (Fed. Cir. 2019)................................................................................2

*Walker v. Beaumont Indep. Sch. Dist.,*
    938 F.3d 724 (5th Cir. 2019) ...................................................................................1

**Statutes**

35 U.S.C. § 101..............................................................................................................1, 2

**Other Authorities**

Fed. R. Civ. P. 12............................................................................................................2

Fed. R. Civ. P. 12(b)(6)...................................................................................................1

Fed. R. Civ. P. 12(c) .......................................................................................................1

*Verizon Wireless* "*Test Man Launch,*" YouTube (2009),
    https://www.youtube.com/watch?v=OPwPo-IAQ-E (2002 Verizon Wireless
    advertisement)..........................................................................................................7

## I.    INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 12(c), Defendant Cisco Systems, Inc. ("Cisco") moves this Court to dismiss the complaint on the basis that the claims of U.S. Patent Nos. 8,213,870 ("'870 Patent"), 8,644,765 ("'765 Patent"), 9,083,401 ("'401 Patent"), 10,200,096 ("'096 Patent"), and 8,270,343 ("'343 Patent") are ineligible under 35 U.S.C. § 101. Cisco also moves to dismiss the complaint's pre-suit willfulness claims, induced infringement claims, and contributory infringement claims for failure to state a claim.

## II.    LEGAL STANDARD

### A.    Rule 12(c) Standard

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is subject to the same standards as a motion to dismiss under Rule 12(b)(6). *Doe v. MySpace Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009). Complaints that fail to state a claim upon which relief can be granted are to be dismissed as a matter of law. Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), a court takes as true all well-pleaded factual allegations and construes them in the light most favorable to the plaintiff. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).

### B.    Patent Eligibility under 35 U.S.C. § 101

In *Alice*, the Supreme Court set forth a two-step test for determining patent claim eligibility. *Alice Corp. Ltd. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014). This inquiry can be decided based on the "intrinsic evidence from the specification without need for extraneous fact finding outside the record." *Secured Mail Sols., LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 912 (Fed. Cir. 2017)

(quotation omitted). And "[l]ike other legal questions based on underlying facts," patent eligibility "may be, and frequently has been, resolved on a Rule 12[] motion." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018). Under *Alice*, when the challenged claims "are substantially similar and linked to the same abstract idea," a single claim may be assessed as representative of the others. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (quotation omitted). Claims that contain additional limitations based on "well-known, routine, and conventional functions" are not distinguishable from the representative claim for purposes of the *Alice* test. *Id.* at 1349.

*Alice* **step one**. The first step is to determine whether the claims are directed to a "patent-ineligible concept," e.g., an abstract idea. *Alice*, 573 U.S. at 217. "Under this inquiry, [courts] evaluate the focus of the claimed advance over the prior art to determine if the character of the claim as a whole, considered in light of the specification, is directed to excluded subject matter." *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1384 (Fed. Cir. 2019) (quotation omitted). The step-one analysis typically begins with an "[e]xamination of earlier [§ 101] cases." *In re Killian*, 45 F.4th 1373, 1383 (Fed. Cir. 2022).

*Alice* **step two**. If a claim is directed to ineligible subject matter, the second step is to determine whether the additional elements recite "an inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217–18. But even if "the techniques claimed are [g]roundbreaking, innovative, or even brilliant . . . that is not enough for eligibility" if "the advance lies entirely in the realm of abstract ideas." *SAP Am.*, 898 F.3d at 1163 (quotation omitted).

To the extent a claim includes nonabstract elements, it is still ineligible if those elements

recite "well-understood, routine, conventional activit[ies] previously known to the industry." *Alice*, 573 U.S. at 225 (quotation omitted). The "inquiry is not whether the claimed invention as a whole is unconventional or non-routine," but "whether the claim limitations other than the invention's use of the ineligible concept to which it was directed were well-understood, routine and conventional." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018).

## III.    ARGUMENT

### A.    The Claims of the '870 Patent Family Are Ineligible[1]

#### 1.    <u>Summary of the '870 Patent Family</u>

The '870 Patent, '765 Patent,'401 Patent, and '096 Patent (collectively, "the '870 Family") share the same specification, stem from a common application, and are identically titled "Beamforming Using Predefined Spatial Mapping Matrices." In doing so, the '870 Family explains that "[t]raditional beamforming" was "based on channel state information (CSI) obtained using a sounding procedure." Dkt. 1-7 ('401 Patent), 2:45-47. A sounding packet was a test signal that was traditionally "communicated from a transmitter to a receiver," from which the receiver calculated the "channel estimate (H) that described characteristics of the channel." *Id.* at 2:48-51. That channel estimate was then used by the transmitter to form channels "employ[ing] [] beamforming techniques, such as to determine a steering matrix," which is "used to map particular data to particular transmit antennas." *Id.* at 2:52-56.

The invention of the '870 Family involves a sounding procedure in which a transmitter stores a set of *predefined* spatial mapping matrices and sends a sounding packet for each. *Id*. at

---

[1]  In advance of this motion, the parties met and conferred. Cisco requested that Velocity Communications Technologies, LLC ("Velocity") identify any claim terms that it believed should be construed prior to the Court's assessment of eligibility. Velocity declined to identify any such terms.

11:30-34, 12:21-24, Fig. 4 (elements 404, 406), Fig. 5 (element 504). The receiver then returns channel state information for each sounding packet to the transmitter. *Id*. at 12:25-27, Fig. 5 (element 506). And using this channel state information, the transmitter selects a spatial mapping matrix based on this received CSI information. *Id.* at 12:27-33, Fig. 5 (element 508). The transmitter can also monitor quality metrics, such as data rate or error rate, and can choose different spatial mapping matrices when the quality metric falls above or below a threshold. *Id.* at Fig. 4, 11:41-48. This procedure can continue until a defined quality metric is met. *Id.* at 11:48-53.

Thus, the claims of the '870 Family address two features, both of which are directed to the abstract concept of feedback. The first feedback feature is "sounding" ("Initial Feedback"), consisting of (1) transmitting sounding packets using different transmission parameters (i.e., spatial mapping matrices); (2) receiving feedback (i.e., CSI) from the receiver in response to sounding; and (3) selecting a transmission parameter based on the feedback. And the second feedback feature ("Continued Feedback") involves modifying transmission parameters in response to a quality metric, consisting of (1) monitoring a transmission-related quality metric (e.g., data rate); and (2) changing transmission parameters when a quality metric threshold is triggered (e.g., data rate falls below a minimum).

2.    Claim 1 of the '401 Patent is representative of the '870 Family claims

Claim 1 of the '401 Patent is representative because all the claims are directed to the same two abstract feedback features. As shown below, limitations [a] through [d] relate to the Initial Feedback, and limitation [e] recites the Continued Feedback.

1. ***A method*** comprising:

[a] storing, in a memory, predefined spatial mapping matrices useful for transmitting data packets to a receiver;

[b] **iteratively transmitting one or more of the data packets to the receiver, each act of transmitting using a different**

4

> **one of the predefined spatial mapping matrices stored in the memory**;
>
> [c] **receiving, from the receiver, channel estimates responsive to iteratively transmitting the one or more data packets;**
>
> [d] **selecting, based on the received channel estimates, one of the predefined spatial mapping matrices** stored in the memory for use in transmitting one or more additional data packets to the receiver; and
>
> [e] **selecting another one of the predefined spatial mapping matrices** when a reception quality metric associated with the one or more additional data packets transmitted to the receiver **fails to meet a reception quality metric threshold.**

'401 Patent, 16:9-26 (emphases added).

The other asserted claims recite the same features or simply add conventional techniques or equipment for the achievement of the same objective.[2] For example, certain independent claims recite antennas for directional transmission,[3] which the '870 Family admits was already known. *See id*. at 1:16-23. Other claims transmit the sounding packet in different directions until a response is received, which is just a more specific result of using different spatial mappings.[4] *See id*. at 2:51-57. Other claims iteratively transmit the sounding packet until an acknowledgment is received.[5] And other claims replace the "quality metric" with specific metrics, such as a "packet error rate"[6] or "data rate,"[7] both of which were conventionally known and discussed without further

---

[2] *See* '870 Patent, claim 1; '765 Patent, claim 1; '096 Patent, claim 1.

[3] *See* '870 Patent, claims 5, 6, 12, 16; '765 Patent, claim 15; '401 Patent, claim 16; '096 Patent, claim 13; *see also* '870 Patent, claims 2, 14; '765 Patent, claims 3, 10, 16 (just reciting different directions).

[4] *See* '870 Patent, claims 2, 5-7, 12, 14-16; '765 Patent, claims 3, 10, 15, 16; '401 Patent, claim 16.

[5] *See* '870 Patent, claims 6, 8-9, 17, 20; '401 Patent, claim 8.

[6] *See* '870 Patent, claim 1; '765 Patent, claims 1, 8, 15; '096 Patent, claims 2, 6, 11, 16, 20.

[7] *See* '870 Patent, claim 1, 17; '401 Patent, claims 2, 9, 17; '096 Patent, claims 3, 6, 11, 16, 20.

explanation in the specification. *Id*. at 5:51-52, 6:58-61. Additional claims recite that additional data training may be transmitted "without channel training,"[8] i.e., "without a sounding procedure." *Id*. at 3:31-36. And further claims require that the feedback be used to select the "optimal" transmission parameters.[9] Finally, certain claims specify a particular frequency range,[10] long-known transmission technique or protocol (e.g., OFDM or cellular protocol),[11] or conventional device (e.g., mobile phone or cellular base station) being used.[12] All of this is conventional technology that does not change the abstract nature of the claims, and claim 1 of the '401 Patent can be treated as representative for the eligibility analysis. *Content Extraction*, 776 F.3d at 1348.

3.    *Alice* Step 1: Claim 1 of the '401 Patent is directed to the abstract concept of feedback

Claim 1 recites five simple steps: transmitting data packets using different transmission parameters (spatial mapping matrices); receiving feedback from the receiver in response; selecting a matrix for subsequent transmissions based on the feedback; monitoring a quality metric; and switching the transmission parameter (the spatial mapping matrix) if the quality metric no longer satisfies a threshold. Thus, claim 1 is merely directed to the combination of two forms of feedback-based adjustment, both of which are abstract: (1) selecting transmission settings based on feedback from a receiver, and (2) changing transmission settings if further feedback falls below a threshold.

Claim 1 is effectively the same process performed by humans when attempting to improve their cell phone reception. Indeed, when a cell phone user receives a call in an area with questionable coverage, the user will commonly attempt to get a clearer reception by physically

---

[8] '870 Patent, claims 4, 11, 15; '765 Patent, claims 5, 11, 19; '401 Patent, claims 5, 13; '096 Patent, claim 8.
[9] '401 Patent, claims 12, 18.
[10] *See* '401 Patent, claim 14; '765 Patent, claims 6, 13, 18.
[11] *See* '765 Patent, claims 7, 14, 17; '401 Patent, claims 7, 20.
[12] *See* '401 Patent, claims 19, 20; '765 Patent, claim 20; '096 Patent, claim 12.

6

changing their location—moving to a different location within a building, stepping outside, or even walking a few feet in another direction. And to judge the transmission quality at each location, a user commonly solicits feedback from the receiver at each location, as Verizon's advertising campaign so famously portrayed: "can you hear me now?"[13] Based on the response from the receiving party (feedback), the user will select a location to continue the call (subsequent transmission). This abstract process of obtaining feedback at the outset of a call mirrors the Initial Feedback portion (elements [a]–[d]) of claim 1 of the '401 Patent. In both scenarios, the transmitters iteratively transmit using different settings (be it physical locations or beamforming matrices), receive feedback from the receiver, select a setting based on the feedback, and subsequently change settings again if a quality metric does not meet a certain threshold. Humans have been performing this form of feedback for half a century.

And if the quality of the call drops below some threshold—because the user can no longer hear, or the receiving side expresses that they have difficulty hearing—the user will switch locations again, to a location where they can (hopefully) hear the other side. This mirrors the Continued Feedback (element [e]) of claim 1 of the '401 Patent.

This Court in *Orostream* held claims directed to "the common process of feedback adjustment" both abstract and ineligible. *Orostream LLC v. ABS-CBN Int'l*, 2015 WL 5836949, at *3 (E.D. Tex. Oct. 1, 2015). And other courts have found claims directed to generic feedback control systems abstract at step one. *Gen. Elec. Co. v. LPP Combustion, LLC*, 773 F. Supp. 3d 117, 119–25 (D. Del. 2025) (finding ineligible claims related to feedback and adjustment to be abstract). Here, claim 1 is directed to nothing more than Initial Feedback and Continued Feedback—equally

---

[13]  Jwyoung5, *Verizon Wireless "Test Man Launch*," YOUTUBE (2009), https://www.youtube.com/watch?v=OPwPo-IAQ-E (2002 Verizon Wireless advertisement).

abstract concepts. And the combination of two abstract ideas does not render a claim any less abstract. *Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1368 (Fed. Cir. 2014).

> 4.   *Alice* Step 2: Claim 1 of the '401 Patent does not add an inventive concept

Given that claim 1 of the '401 Patent is directed to an abstract idea, the claim is not patent eligible unless it adds an "inventive concept" that ensures the claim covers significantly more than the ineligible idea itself. *Alice*, 573 U.S. at 222. Claim 1, however, contains no such inventive concept—it merely applies the abstract concept to generic computer wireless networking equipment.

Claim 1 recites generic components, such as a (i) "storing, in memory … matrices useful for transmitting data packets to a receiver"; (ii) "iteratively transmitting one or more data packets to the receiver"; (iii) "receiving ... channel estimates responsive to iteratively transmitting the one or more data packets"; (iv) "selecting … spatial matrices stored in the memory for use in transmitting one or more additional data packets to the receiver"; (v) "selecting … matrices based on quality of reception of … data packets sequentially transmitted to the receiver"; and (vi) "selecting another … matrices when a reception quality associated with one or more additional data packets transmitted to the receiver falls to meet a reception quality metric threshold." '401 Patent, claim 1. But the mere recitation of generic technology cannot transform a claim beyond the abstract. *Smartflash LLC v. Apple Inc.*, 680 F. App'x 977, 983 (Fed. Cir. 2017) ("[M]erely storing, transmitting, retrieving, and writing data to implement an abstract idea on a computer does not transform the nature of the claim into a patent-eligible application." (quotation omitted)).

Similarly, the patent admits that the processes of beamforming, sounding, and the calculation of channel estimates are conventional and well known. *See* '401 Patent at 1:34-45 (background). As the patent's background explains, "[b]eamforming is a technique that can increase the directivity of transmitted data packets … ***traditionally,*** channel state information is

8

maintained by the transmitter using explicit beamforming, where the transmitter ***sends a sounding packet to the receiver, and in response the receiver feeds back information to the transmitter*** regarding characteristics of a channel that was used to send the sounding packet." *Id.* (emphasis added); *see also id.* at 4:34-36 ("a sounding procedure was utilized in traditional beamforming techniques to derive channel state information (CSI).")

Critically, claim 1 of the '401 Patent recites purely generic and functional limitations. The patent specification does not explain any mechanism for generating the predefined spatial mapping matrices or measuring the feedback. *Id.* at 3:27-34. Nor does it describe any particular mechanism for monitoring a quality metric. *Id.* at 5:45-53; *see also In re TLI Commc'ns*, 823 F.3d 607, 614-15 (2016) (finding claims did not survive *Alice* step two where "abstract functional descriptions [were] devoid of technical explanation as to how to implement the invention").

### B.    The Claims of U.S. Patent No. 8,270,343 Are Patent Ineligible

#### 1.    Summary of the '343 Patent

The '343 Patent relates to "content delivery in data networks," in which a system broadcasts information containing both "textual and multimedia content"—such as webpages—over wireless systems. Dkt. 1-4 ('343 Patent) at 1:6–9, 2:37-40. The '343 Patent recognizes that a "content provider will often add multimedia content" to make "document[s] look attractive." *Id.* at 2:46-50. The '343 Patent also recognizes that an existing standard, DVB-H, had "incorporated a technique of 'time-slicing,'" which was "a mechanism that regroups data into bursts." *Id.* at 1:60-62. Each "burst" was a "quantity of data that is sent in a small amount of time." *Id.* at 1:62-63. A "data carousel" was a "known mechanism" for transmitting this data in a cyclic manner. *Id.* at 2:16-31.

An exemplary application for these transmissions was "electronic service guide[s] (ESG[s])." *Id.* at 1:6-10, Fig. 4. In that ESG application, the text data could be "semantic data,"

9

and the multimedia data could be "presentation data." The '343 Patent explains that this "semantic" (text) data "is more critical for the user than presentation data" (multimedia), because "semantic . . . data is essential and sufficient to begin watching TV whereas presentation data is provided to make the . . . guide more attractive." *Id.* at 8:65-9:2. As shown in Figure 4, the "semantic" (text) data consists of the actual television program listings (element 420), while the "presentation" (multimedia) consists of pictures that could be associated with each channel (element 415). *See id.* at 8:62-9:7, Fig. 4. The inventors also recognized that "semantic data" (text) "is likely to change quite often," while "presentation data" (multimedia) "is more stable and static." *Id.*

While the '343 Patent admits that "time-slicing"—a "mechanism that regroups data into bursts"—already existed ('343 Patent, 2:60-64), the patent proposes embodiments in which "a broadcast signal [] compromise[s] at least one semantic file in each burst … and fill[s] the available space with presentation data." *Id.* at 5:27-31. This is so that semantic data (which the '343 Patent explains is the essential text data) is broadcast in every burst to ensure that data is consistently available. And similarly, multimedia content may be segmented across multiple bursts so that multimedia is less essential. However, asserted claim 10 does not impose any requirement that the text data be included in every transmission. Instead, claim 10 consists of only four steps: (1) receiving the text file and the multimedia; (2) storing the text file as a single textual data block; (3) segmenting the multimedia file into multiple sub-blocks; and (4) transmitting the text and multimedia to a remote device in time-sliced packets:

> 10.  ***A method of broadcasting a text file comprising textual information and multimedia information*** to a remote receiver unit in a wireless communication system, the method comprising the steps of:
>
> ***receiving the text file and the multimedia information***;
>
> ***storing the text file as a single textual data block*** including the

10

textual information;

*partitioning the multimedia information into multiple multimedia data sub-blocks*, each multimedia data Sub-block including a portion of the multimedia information; and

*providing the single textual data block and the multimedia data sub-blocks to a broadcast transmitter in multiple time-sliced packets for broadcasting* to a remote receiver unit.

'343 Patent at 12:12-26 (emphases added).

> 2.      Claim 10 of the '343 Patent is representative

The '343 Patent contains two independent claims, which mirror one another. Claim 1 parallels claim 10 and simply adds a "server operably coupled" to the transmitter to perform the same four steps as claim 10. The dependent claims of the '343 Patent add only conventional and well-known techniques or structure that fail to distinguish them from their independent claim: (i) a multiplexer to multiplex the time-sliced packets (claims 2, 12); (ii) text that is "semantic information" and "presentation information" (claims 3, 13); "electronic service guide" (claims 4, 14); "digital video broadcast transmission" (claim 5); a "data carousel" for "cyclically transmitting" (claims 6, 15); "each data sub block includes … all of the textual information . . . and one or more multimedia sub-blocks" (claim 8); "multiplex … with MPEG" (claim 16).

> 3.      *Alice* Step 1: Claim 10 is directed to the abstract idea of "receiving, manipulating, and transmitting data"

Representative claim 10 fails *Alice* step one because it is directed to the abstract idea of merely formatting data transmissions—a concept repeatedly found abstract. *See Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 537 (Fed. Cir. 2020); *Entropic Commc'ns, LLC v. DISH Network Corp.*, 767 F. Supp. 3d 1043, 1066 (C.D. Cal. 2025). Specifically, claim 10 requires the steps of (1) receiving the text file and the multimedia information; (2) storing just the text file as a single textual data block; (3) segmenting the multimedia file into multiple data sub-blocks;

and (4) transmitting the data to the remote device in time-sliced packets, which is directed to nothing more than the idea of selecting a data format.

            4.       *Alice* Step 2: Claim 10 lacks any inventive concept

Claim 10 of the '343 Patent also fails at *Alice* step two, because it lacks an "inventive concept." Keeping more important data (e.g., the text file) together, while parsing up the less important data (the multimedia), is not inventive. Nor does claim 10 recite any particular method for "storing the text file as a single textual data block" or for "partitioning the multimedia information into multiple multimedia data sub-blocks." Instead, the claim is drafted in a purely functional manner, in that it simply recites an intended result. And "the abstract idea to which a claim is directed"—the storing of the text file as a single textual data block and the portioning of the multimedia file—cannot supply the inventive concept. *See BSG Tech*, 899 F.3d at 1290–91. Accordingly, the '343 Patent claims must fail at *Alice* step two.

**C.      Velocity's Pre-Suit Willfulness Claims Should Be Dismissed**

Velocity fails to plausibly allege any pre-suit knowledge of the asserted patents, as required to plead pre-suit willfulness. *See Dialect, LLC v. Bank of Am., N.A.*, 2024 WL 4980794, at *2 (E.D. Tex. Dec. 4, 2024). Velocity's purported allegations of pre-suit knowledge fall into two categories: (i) allegations that predecessors-in-interest to the asserted patents submitted Letters of Assurance to the Institute of Electrical and Electronics Engineers ("IEEE") stating that they had patents related to an IEEE standard, and (ii) a letter Velocity's counsel sent to Cisco on April 15, 2025 (Dkt. 1-23) stating that Velocity owned patents related to various standards. *See* Dkt. 1, ¶¶ 23, 68, 72, 86, 90, 104, 108, 122, 128, 140, 144, 158, 162, 176, 180, 194, 198, 212, 230, 248, 252. But Velocity does not allege that either of these Letters of Assurance, nor Velocity's April 15, 2025 letter, actually identify any patents, let alone any asserted patent. And to the extent that Velocity argues that the Letters of Assurance or its counsel's pre-suit letter identified a patent portfolio, that

is not enough to support a claim of willfulness. *Dialect*, 2024 WL 4980794, at \*3 (citing *Bench Walk Lighting LLC v. LG Innotek Co., Ltd.*, 2021 WL 65071, at \*11-12 (D. Del. 2021), *report and recommendation adopted*, 2021 WL 1226427, at \*4 (D. Del. Mar. 31, 2021)).

In fact, allegations of the exact type presented by Velocity have been previously rejected. *Atlas Glob. Techs., LLC v. Sercomm Corp.*, 638 F. Supp. 3d 721, 728 (W.D. Tex. 2022) (rejecting allegation that defendant "has known that [plaintiff] possessed patents relating to the 802.11ax Standard since at least March 11, 2015[,] when Newracom submitted a Letter of Assurance for Essential Patent Claims ... to the IEEE" and defendant "also knew of the Asserted Patents on June 1, 2021, when [plaintiff] notified [defendant] of them" as insufficient to satisfy the knowledge requirement for a claim of pre-suit willfulness).

Velocity also includes a boilerplate allegation that "Cisco did not take a license to the patents-in-suit, but instead proceeded to infringe," that "Cisco willfully blinded itself to its infringement of the patents-in-suit," and that "Cisco believed with high probability that its Wi-Fi 6 products infringed but took deliberate action to avoid learning further details of its infringement." *See* Dkt. 1, ¶¶ 73, 91, 109, 127, 145, 163, 181, 199, 217, 235, 253. These allegations are also implausible and further require dismissal of Velocity's pre-suit willfulness claims.

A showing of willful blindness requires more. Specifically, a plaintiff must plausibly allege that "(1) the defendant [] subjectively believe[s] that there is a high probability that a fact exists," i.e., that they infringe, and "(2) the defendant [took] deliberate actions to avoid learning of that fact." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). Here, Velocity's complaint contains no facts to support any such allegation. First, Velocity has not plausibly alleged that Cisco "subjectively believe[d] that there is a high probability" that it infringes. That is because "[m]erely pleading that the defendant was aware of a patent portfolio without more, as [Velocity]

13

has done here, is not enough" to plausibly allege that Cisco had a subjective belief that it infringes. *Atlas Glob. Techs.*, 638 F. Supp. 3d at 729. Second, Velocity pleads no facts to support an allegation that Cisco took deliberate actions to avoid learning of infringement. Velocity's own letter fails to provide Cisco with the number of any asserted patent, and it declines to inform Cisco of how any patent is supposedly infringed.

Without a plausible allegation of pre-suit knowledge or willful blindness, Velocity's pre-suit willfulness claim must be dismissed.

### D.    Velocity's Pre-Suit Induced- and Contributory-Infringement Claims Should Be Dismissed

Velocity's claims of pre-suit induced and contributory infringement should be dismissed, because, like willfulness, these claims also require pre-suit knowledge of the asserted patents. *Dialect*, 2024 WL 4980794, at *3-4. As discussed above (*supra* at 11-12), Velocity fails to plead that Cisco had knowledge of any asserted patent prior to filing of the complaint, and its pre-suit claim of induced and contributory infringement should be dismissed. *Id*.

## IV.    CONCLUSION

Because the Asserted Patents are directed to ineligible subject matter, the Court should grant Cisco's motion.

Dated: September 19, 2025

WINSTON & STRAWN LLP

By: */s/ Krishnan Padmanabhan*
Krishnan Padmanabhan (*pro hac vice*)
kpadmanabhan@winston.com
WINSTON & STRAWN LLP
200 Park Ave.
New York, NY 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

Robert Kang (*pro hac vice*)
rkang@winston.com
101 California Street, 21st Floor
San Francisco, CA 94111-5840
Telephone: (415) 591-1565
Facsimile: (415) 787-5264

POTTER MINTON, P.C.

Michael E. Jones
Texas Bar No. 10929400
102 N. College, Suite 900
Tyler, Texas 75702
Telephone: (903) 597-8311
Facsimile: (903) 593-0846
E-mail: mikejones@potterminton.com

Shaun William Hassett
Texas Bar No. 24074372
102 N. College, Suite 900
Tyler, Texas 75702
Telephone: (903) 525-2272
E-mail: shaunhassett@potterminton.com

*Attorneys for Defendant*

i

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served this 19th day of September, 2025, with a copy of the foregoing document via the Court's CM/ECF system.

/s/ *Krishnan Padmanabhan*
Krishnan Padmanabhan

ii